IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMIERCA | CIVIL ACTION FILE |
| v. | NUMBER 3:14-CR-00014-TCB |
| MARGARET ROSSO, | |
| Defendant. | |

## **O R D E R**

This case comes before the Court on Magistrate Judge Russell G. Vineyard's Final Report and Recommendation (the "R&R") [91], which recommends that the following motions, all filed by Defendant Margaret Rosso, be denied: motion to dismiss the indictment due to inexcusable pre-indictment delay [28]; motion to dismiss the indictment, or alternatively, to strike surplusage or preclude jury access to the indictment [29]; motion to suppress evidence [30 & 31]; and motion to suppress statements [32]. Rosso has filed objections to the R&R [99].

## I.  Legal Standard on Review of a Magistrate Judge's R&R

A district judge has a duty to conduct a "careful and complete" review of a magistrate judge's R&R. *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. Unit B 1982)).[1] Where a party objects to an R&R, a district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The district judge must "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990). Those portions of the R&R to which no objection is made need only be reviewed for clear error. *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).[2]

---

[1] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by the Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n.4 (11th Cir. 2009) (discussing continuing validity of *Nettles*).

[2] *Macort* addressed only the standard of review applied to a magistrate judge's factual findings, but the Supreme Court has held that there is no reason for a district court to apply a different standard of review to a magistrate judge's legal conclusions. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Thus, district courts in this circuit have routinely applied a clear-error standard to both. *See Tauber v.*

"Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive or general objections need not be considered by the district court." *Nettles*, 677 F.2d at 410 n.8. "This rule facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." *Id.* at 410.

After conducting a complete and careful review of the R&R, the district judge may accept, reject or modify the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Williams*, 681 F.2d at 732. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1)(C). The district judge also has discretion to decline to consider arguments that were not raised before the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009). Indeed, a contrary rule "would effectively nullify the magistrate judge's

---

*Barnhart*, 438 F. Supp. 2d 1366, 1373-74 (N.D. Ga. 2006) (collecting cases). By contrast, the standard of review on appeal distinguishes between factual findings and legal conclusions. *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir. 1991) (when magistrate judge's findings of fact are adopted by district court without objection, they are reviewed on appeal under plain-error standard, but questions of law remain subject to de novo review).

consideration of the matter and would not help to relieve the workload of the district court." *Id.* (quoting *United States v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000)).

## II.   Rosso's Objections to the R&R

Rosso is charged with conspiracy and unlawful distribution of controlled substances stemming from her time as the office manager for the Angel Pain Relief Center (the "Pain Center") in Peachtree City, Georgia. The Court presumes familiarity with the facts of the case, as recited thoroughly in the R&R. Additional facts will be included where relevant to the Court's decision.

### A.   Hearing on Pre-Indictment Delay

Rosso objects to Magistrate Judge Vineyard's denial of her motion to dismiss the indictment due to pre-indictment delay [28] without holding an evidentiary hearing. Rosso does not explicitly object to the recommendation to deny the motion, but implicit in the request for a hearing is the assertion that the motion would have been granted if a hearing had taken place.

Rosso contends that the pre-indictment delay prejudiced her case in the following ways: 1) Leroy Toliver died, "precluding Defendant from calling [him] as a witness"; 2) the Government has lost evidence; 3) Special Agent Anthony Byrd and "other government agents and witnesses" have limited memories of the events; and 4) recordings made by law enforcement are of poor quality. Rosso further asserts that because the delay was not investigative, it must have been for tactical reasons, and she should have the opportunity to subpoena the Government for more information regarding the delay.

The statute of limitations for the offenses charged is five years. 18 U.S.C. § 3282(a). Charges brought within the statute of limitations period may nonetheless be dismissed if a defendant can show: "1) that the delay caused actual prejudice to the conduct of [her] defense *and* 2) that the government intentionally caused the delay in order to gain a tactical advantage over the defendant." *United States v. Caporale*, 806 F.2d 1487, 1514 (11th Cir. 1986). Prejudice will not be presumed, but must be "actual substantial prejudice." *United States v. Foxman*, 87 F.3d 1220, 1222 (11th Cir. 1996). "[W]here the record shows no reason

for the delay (or where delay is due to simple negligence), no due process violation exists." *Id.* at 1223 n.2.[3]

Rosso has not made a showing that the delay was deliberate in order to gain a tactical advantage. Instead, Rosso argues that the delay was not for investigative reasons, and that it can therefore be presumed that the delay must have been tactical. Even assuming that the delay was not for investigative reasons, the Court will not presume the Government acted with an improper purpose. *See Foxman*, 87 F.3d at 1223 n.2 ("[W]here the record shows no reason for the delay . . . no due process violation exists.").

Rosso seeks to excuse this failure by alleging that an evidentiary hearing would enable her to prove the Government's deliberate delay. Yet she does not allege any plausible reason the Government would have deliberately delayed bringing charges. Instead, Rosso hopes that

---

[3] *See also United States v. Butler*, 792 F.2d 1528, 1534 (11th Cir. 1986) ("At most, the evidence shows that the government failed to prosecute the case earlier because it 'wasn't interested' in the case. The government's inaction in bringing the case is insufficient, standing alone, to establish that the government's actions were motivated by an attempt to gain a tactical advantage."); *Stoner v. Graddick*, 751 F.2d 1535, 1543 (11th Cir. 1985) (denying due process claim where "the state has not proffered a good, detailed reason for the delay," but "no bad faith reason existed either").

6

additional discovery would reveal a sinister motive that she has no reason now to believe exists, and the Court need not authorize additional baseless discovery to enable this speculation. *See United States v. Lindstrom*, 698 F.2d 1154, 1159 (11th Cir. 1983) (holding that an evidentiary hearing on pre-indictment delay was inappropriate "until the defense at least has suggested what tactical advantage the government could gain from the delay").

Even if Rosso could allege that the delay was deliberate, she has not made a showing of actual, substantial prejudice. Her chief claim of prejudice is that Leroy Toliver, an attorney and pharmacist who allegedly advised Rosso, died before charges were brought. However, Toliver died unexpectedly on February 5, 2011, only nine months after the raid on the Pain Center, and only about five months after Rosso's counsel made the Government aware of Toliver's relevance to Rosso's defense. *See* [28], p. 2. Prejudice from his death can only be attributed to the Government's delay if the Government could have brought this case and gone to trial before February of 2011, and it is unreasonable to expect that could have occurred.

Rosso next complains that Agent Byrd and other witnesses do not have good memories of the events that occurred. However, Agent Byrd testified at a suppression hearing on April 15, 2015 [61]. The Court has reviewed the transcript of that hearing [65] and finds that Agent Byrd was able to testify about the events in question, and the Court credits Magistrate Judge Vineyard's determination that Agent Byrd "was able to testify about the investigation and provide an independent recollection as to specific details that occurred." Moreover, Rosso does not claim that her own witnesses—whom she has not identified—have diminished memories, and it is hard to see how diminution of the witnesses the Government intends to rely on would prejudice Rosso.

Finally, Rosso alleges that audio and video recordings made by law enforcement are "of such poor quality so as to render them useless." But there is no allegation that the quality has deteriorated over time, so the alleged prejudice based on law enforcement's unsophisticated recording methods cannot be attributed to a delay in bringing charges. Rosso's remaining claim, that "the government lost track of the bulk of its evidence," is wholly unsubstantiated, and Rosso makes no showing

that any allegedly existing additional evidence would have helped her defense. *See United States v. Willis*, 583 F.2d 203, 208 (11th Cir. 1978) ("[A]ctual prejudice and not merely the real possibility of prejudice inherent in any extended delay . . . is a necessary element which must be shown before the restraints of the due process clause will be applied to bar a prosecution because of a delay.").

In short, Rosso has not credibly alleged that the delay was a deliberate choice by the Government for tactical advantage, and hence a hearing on the matter would be unnecessary. Moreover, Rosso has failed to show actual, substantial prejudice. Accordingly, her motion to dismiss the indictment due to pre-indictment delay [28] is denied.

### B.   Motion to Strike Surplusage

Rosso objects to the denial of her motion to dismiss the indictment, or alternatively, to strike surplusage or preclude the jury from having access to the indictment [29]. The indictment charges 86 counts against Rosso. Count one is broken down into five sections: 1) "Introduction," comprised of paragraphs 1 through 7; 2) "Defendants," comprised of paragraphs 8 and 9; 3) "The Agreement," comprised of

paragraph 10; 4) "Nature and Purpose of the Conspiracy," comprised of paragraphs 11 and 12; and 5) "Manner and Means of the Conspiracy," comprised of paragraphs 13 through 19. Rosso objects to all but "The Agreement," contending that "Paragraph 10 of the Indictment standing alone" would be sufficient to charge her under 21 U.S.C. § 841. She also objects to paragraphs 20, 22 and 24 because they incorporate the "Introduction" and "Defendants" sections into later counts.

Rosso's motion is styled as a "motion to dismiss the indictment, or in the alternative, motion to strike surplusage," but her arguments focus entirely on the alleged surplusage. Rosso contends that if the surplusage was cut, the indictment would still "satisfy[y] the requirement of what needs to be in [an] Indictment." As such, Rosso concedes that the indictment contains sufficient language to charge the offenses, and hence the indictment should not be dismissed outright.

Rule 7(c) of the Federal Rules of Criminal Procedure requires that the indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Counts "may incorporate by reference an allegation made in another count," and may

allege that the defendant committed the offense "by one or more specified means." FED. R. CRIM. P. 7(C). Language should not be struck from the indictment "unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial. . . . [T]his is a most exacting standard." *United States v. Awan*, 966 F.2d 1415, 1426 (11th Cir. 1992) (quoting *United States v. Huppert*, 917 F.2d 507, 511 (11th Cir. 1990)).

The objected-to paragraphs of the indictment are plainly relevant to the charges. They explain specific portions of the Controlled Substances Act and describe the manner in which the Government alleges Rosso and co-defendant Tony Hightower violated that Act. These paragraphs would only lack relevance if the Government subsequently abandoned the allegations at trial. Rosso is correct that the Government did not need to include each of these paragraphs, but that does not mean that they are irrelevant to the charged offenses. *See* FED. R. CRIM. P. 7(C) ("A count may allege that . . . the defendant committed [the offense] by one or more specified means."); *United States v. Huppert*, 917 F.2d 507, 511 (11th Cir. 1990), *abrogated on other grounds by*

11

*United States v. McQueen*, 86 F.3d 180 (11th Cir. 1996) (upholding the inclusion of background information in the indictment that went solely to "the purpose of the grand jury investigation"). Moreover, Rosso has failed to show, beyond conclusory statements, how the language of the indictment is inflammatory or prejudicial, an essential element of a motion to strike surplusage.

Accordingly, Rosso's motion to dismiss the indictment or strike surplusage [29] is denied. Nevertheless, because the Eleventh Circuit has explained that such motions may be stayed "until the trial court has heard evidence that will establish the relevance of the allegedly surplus language," *Awan*, 966 F.2d at 1426, Rosso will be permitted to renew this motion after introduction of the Government's evidence at trial.

### C.   Search of Rosso's Purse

Rosso objects generally to the admission of evidence stemming from a search of her purse, and asks for a hearing on her motion to suppress that evidence [30].

"[I]n determining whether a search of personal effects violates the scope of a 'premises' warrant, one must consider the relationship

between the object, the person and the place being searched." *United States v. Young*, 909 F.2d 442, 444-45 (11th Cir. 1990). When searching for evidence of the distribution of controlled substances on a premises warrant, courts have upheld the search of a locked briefcase belonging to a homeowner, *United States v. Gonzalez*, 940 F.2d 1413, 1420 (11th Cir. 1991), and the search of an attaché bag belonging to the director of a pain management clinic, *United States v. Votrobek*, No. 4:11-cr-022-RLV-WEJ, 2012 WL 6929277, at *8 (N.D. Ga. June 25, 2012) *report and recommendation adopted*, 2013 WL 298037. Such warrants may also justify the search of personal items belonging to visitors. *See United States v. Johnson*, 475 F.2d 977, 978-79 (D.C. Cir. 1973) (upholding search of unattended purse belonging to a visitor in a home used for narcotics distribution).

Here, Rosso explains that "upon entering the premises of the [Pain Center], law enforcement agents observed Defendant's closed purse on an office desk."[4] Agent Byrd testified at the suppression hearing that

---

[4] During the raid, Rosso indicated to law enforcement that the purse belonged to her, but she alleges that those statements should be suppressed. The Government does not oppose this assertion, and therefore the Court will not

the door to the Pain Center opened to a waiting room, beyond which was an "open office" with "kind of like [a] cubicle setting." [65], p. 15.

If the purse belonged to an employee, it was plainly within the scope of the warrant, as employees have "a special relation to the place," and it could reasonably be expected that the items described in the warrant would be found in an employee's purse. *See United States v. Micheli*, 487 F.2d 429, 432 (1st Cir. 1973) (discussed approvingly by the Eleventh Circuit in *Young*). Seeing the unattended purse on a desk inside the Pain Center—in the office area beyond the waiting room—it would be reasonable to assume that it belonged to Rosso, who law enforcement knew to be an employee. At worst, the unattended purse of a patient found in the back office of the pain clinic would likely contain the fraudulent prescriptions described in the warrant, and as a recipient of fraudulent prescriptions these patients were more than "mere visitor[s] or passer[s]by" to the clinic. *Micheli*, 487 F.2d at 432; *accord United States v. Gray*, 814 F.2d 49, 51, (1st Cir. 1987) (applying the same standard as *Young* to conclude that the search of an

---

consider in its analysis any statements made by Rosso during the May 10 raid on the Pain Center.

unattended jacket, even if police believed it belonged to a visitor, was appropriate given a premises warrant to search for drugs at a house shortly after a drug deal took place).

Rosso erroneously contends that *Young* "requires law enforcement to make a determination as to the ownership of the item to be searched prior to searching it." While ownership is certainly relevant to the consideration, there is no bright-line rule, and instead law enforcement must consider all relevant factors to determine whether a personal item is within the scope of the premises warrant. *See Gray*, 814 F.2d at 51 (scope of premises warrant is judged based on "the plausible inferences" law enforcement could draw from the "entire array of facts" available at the time of the search). Rosso also tries to distinguish purses from briefcases or backpacks, which she asserts are more likely to contain business papers. However, the warrant here authorized law enforcement to search for pills and currency in addition to business papers, and a purse is a logical place to search for those items. *See Johnson*, 475 F.2d at 979 (upholding search of a purse for narcotics

because "the police could reasonably have believed that items sought and described in the warrant had been concealed in the purse").

Because law enforcement could reasonably assume that an unattended purse on an office desk would contain the items specifically described in the warrant, the search of Rosso's purse was authorized by the warrant, and Rosso's motion to suppress [30] is denied.

### D. Suppression of Rosso's Statements

Rosso objects to the denial of her motion to suppress statements made to law enforcement [32]. A hearing on the issue was held before Magistrate Judge Vineyard [61], and was subsequently briefed by the parties [75, 80, 85]. The Court has carefully reviewed the hearing transcript and briefs in considering this motion.

Rosso does not dispute that she validly waived her Sixth Amendment rights when speaking with law enforcement on May 21, but she contends that her waiver was limited in scope to questions concerning "the ongoing threat presented to the public by Dr. [John] Gatell." Accordingly, Rosso contends that any statements she made in response to questions on other topics should be suppressed.

16

A defendant may waive Sixth Amendment rights, "so long as relinquishment of the right is voluntary, knowing and intelligent." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). When a defendant initiates contact with law enforcement in order to give a statement, a waiver has occurred. *United States v. Turner*, No. 1:13-cr-276-ODE, 2015 WL 4042148, at *13 (N.D. Ga. June 30, 2015) (citing *United States v. Gonzalez*, 183 F.3d 1315 (11th Cir. 1999)). Following a waiver of Sixth Amendment rights, a defendant may later invoke the right to counsel, and law enforcement is bound to scrupulously honor that invocation. *See Davis v. United States*, 512 U.S. 452, 458 (1994) ("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."); *United States v. Williams*, 435 F. App'x 868, 870 (11th Cir. 2011) (per curiam) (noting that generally "the law requires an officer to scrupulously honor a defendant's request to speak with his attorney"). Invocation of the right to counsel may be topically limited by the language of the defendant's request. *See Cervi v. Kemp*, 855 F.2d 702, 706-07 (11th Cir. 1988)

17

(recognizing that a "defendant may, by his own language, limit his request for counsel to certain settings") (citing *Connecticut v. Barrett*, 479 U.S. 523 (1987)). The question of whether invocation or waiver has occurred is an objective one. *Davis*, 512 U.S. at 458-59.

### 1. General Scope of Waiver

At the beginning of the interview, Agent Byrd read Rosso her *Miranda* rights and reminded her "if at any point you want to evoke [*sic*] your rights or whatever, you tell us okay." [75-8], p. 3. Rosso indicated that she understood her rights, and initialed each sentence of the prepared *Miranda* form. *Id.* at 3-4, 12. She did not indicate that she wanted to speak about only certain topics, nor at that time did she indicate that she'd want her lawyer present for certain questions.

In response to the first question from Agent Byrd, Rosso stated "Steve Sadow is my attorney and he asked me not to elaborate too expansively or anything." *Id.* at 5. Rosso did not specify what she meant by that, and instead offered an unprompted discussion of her own involvement in the case, saying "I didn't know I was doing anything wrong. . . . I had wanted to quit over and over and over and over again."

18

*Id.* Rosso then stated that "[t]he concern I have right now and what I wanted to bring to your attention right now is that [Dr. Gatell] is calling all of the patients . . . and telling them that . . . if they can get him some money, he can go ahead and mail them the prescriptions." *Id.* at 6.

Rosso now contends that these references to Dr. Gatell limited the scope of her Sixth Amendment waiver to just questions about Dr. Gatell's ongoing activities. However, whenever Rosso expressed a willingness to speak about Dr. Gatell, she never indicated that other topics were unwelcome, nor did she link that topic—Gatell's current activities—to any advice from counsel or a desire to have counsel present. Taken objectively, these statements about Dr. Gatell may explain Rosso's motivation for arranging the interview,[5] but they do not evince a desire to limit her Sixth Amendment waiver, especially when these statements came just minutes after Rosso indicated she

---

[5] A point Rosso now recognizes: "When Defendant initially contacted Agent Byrd and expressed her desire to meet with him, she stated **her purpose** was to advise law enforcement about Gatell's present activities." Defendant's Objections to the United States Magistrate Judge's Final Report and Recommendation and Brief in Support Thereof [99], p. 15 (emphasis added).

understood her *Miranda* rights.[6] As such, Rosso never indicated a limit on the scope of her Sixth Amendment waiver, and law enforcement was free to ask Rosso about any topics related to the Pain Center.

## 2. Specification Invocations of Right to Counsel

Twice during the interview Rosso gave more definitive statements about having counsel present, each of which amounted to a specific invocation of the right to counsel. First, about twelve minutes into the interview, Rosso offered that she knew the names of "four pain control doctors" other than Dr. Gatell who were committing fraud. [75-8], p. 13. When asked to identify those doctors, Rosso stated that "No, not till my charges are gone . . . . At that point that Steven Sadow I want him to help with that." *Id.* at 14. Here, by tying her desire for assistance of counsel to a particular line of questioning, Rosso indicated a particular

---

[6] Near the end of the interview, Rosso comes close to enunciating a limit on the scope of her waiver when she states: "Well, as I explained before, I want to go ahead and help you with everything and everything that [Gatell] deserves, however, the attorneys have told me in no uncertain terms—." [75-8], p. 84. At that point Rosso, who had been searching on her phone for a particular phone number, abruptly stopped to tell the agents she had found the phone number. She did not return to the topic or further explain her lawyer's instructions, and instead proceeded to ask the agents questions about why Tony Hightower had not been arrested sooner.

topic on which she would not answer questions without an attorney present. By Rosso's own terms this was not a general invocation that would require all questioning to stop, but once Rosso made this statement law enforcement could not continue to question her about doctors other than Dr. Gatell. *Accord United States v. Boyer*, 914 F.2d 144, 146 (8th Cir. 1990) ("[A] limited invocation of the right to counsel does not preclude the admissibility of statements a defendant makes which fall outside the limited invocation."). Agent Byrd complied by returning to questions about Dr. Gatell. *See* [75-8], p. 14 ("Okay. Well, let's get back to Dr. Gatell.").

Approximately an hour and a half later, Rosso gave an unprompted offer to help the agents investigate other doctors: "I mean I'll help you get that other doctor who is um—you can walk in the door and pay the money and get any script you want." *Id.* at 101. Investigator Tanya Tyson responded by urging Rosso to "go on, if you wanted to, give it [to] us because that's not going to be a bargaining tool." *Id.* The response from Rosso is muddled, but she twice invoked Sadow's name and steered the question away from the identity of other

21

doctors. While Rosso had previously invoked her right to counsel concerning discussion of doctors other than Gatell, Inv. Tyson's question here did not violate Rosso's rights because they occurred after Rosso had re-engaged law enforcement on this topic. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that once invocation has occurred, further questioning would be inappropriate "unless the accused himself initiates further communication, exchanges, or conversations with the police"). The topic of identifying other doctors did not otherwise come up again.

A second specific invocation occurred during Agent Byrd's last substantive question of the interview. When Rosso was asked about her involvement in signing prescription pads, she responded "I think that's something Mr. Sadow should answer." [75-8], p. 103. While the topical limitations of this second invocation are less clear, law enforcement was nonetheless bound to scrupulously honor the invocation. The record shows that Agent Byrd responded by informing Rosso "Okay, and that's fine. Um, what we do is . . . whenever [Sadow] comes back from vacation, you've got my phone number." *Id.* At that point Rosso offered

22

unprompted statements about other patients Agent Byrd could contact, and Agent Byrd responded with clarifying questions, but did not ask any further questions about Rosso's involvement with the prescription pads. There was no further mention of that topic.

Following each of these specific invocations, the Government respected the invocation, and did not ask any questions on that topic unless Rosso re-initiated that line of conversation. Accordingly, Rosso's Sixth Amendment rights were not violated with respect to her specific invocations. *Accord United States v. May*, No. 14-136, 2014 WL 6775283, at *11 (D. Minn. Dec. 2, 2014) (finding no Sixth Amendment violation where "the officers did not subsequently ask questions about the limited areas Defendant said he would not talk about in the absence of counsel").

### 3. Conclusion on Waiver

Because there was no over-arching limitation on the scope of Rosso's waiver, and because law enforcement honored her two specific invocations of the right to counsel, Rosso's motion to suppress statements [32] is denied.

23

## III.  Remaining Portions of the R&R

The Court has carefully reviewed the portions of the R&R to which Rosso has not objected. Having done so, the Court finds no plain error in Magistrate Judge Vineyard's factual and legal conclusions.

## IV.  Conclusion

For the foregoing reasons, the Court adopts as its Order the R&R [91]. Rosso's pre-trial motions [28 – 32] are DENIED.

IT IS SO ORDERED this 12th day of November, 2015.

_____
Timothy C. Batten, Sr.
United States District Judge